# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | |
|---|---|
| BILLIE JO SWAFFORD | ) |
| | ) |
| Plaintiff, | ) |
| | )    No. 1:18-cv-5 |
| v. | ) |
| | )    Judge Christopher H. Steger |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**I.      Introduction.**

This action was timely instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the Commissioner's final decision denying Billie Jo Swafford's ("Plaintiff") claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act. Plaintiff seeks benefits on the basis of mental illnesses as well as obesity. The parties have consented to entry of final judgment by the United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c), with any appeal to the Court of Appeals for the Sixth Circuit [Doc. 17].

Plaintiff's Motion for Judgment on the Administrative Record [Doc. 18] and Defendant's Motion for Summary Judgment [Doc. 21] are before the Court. For the reasons stated in this memorandum opinion, the Court will **AFFIRM** the Commissioner's decision, **DENY** Plaintiff's motion and **GRANT** the Commissioner's motion.

## II.     Background

### I.     Procedural History

Plaintiff filed her applications for disability insurance benefits under Title II, and for SSI under Title XVI, in November 2013 and March 2014 respectively (Tr. 20, 170-71, 172-92). Plaintiff's claims were denied initially (Tr. 99-104) and on reconsideration (Tr. 110-13). On August 16, 2016, following a hearing, an administrative law judge ("ALJ") found that Plaintiff was not under a "disability" as defined in the Act (Tr. 20-41). On November 17, 2017, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 1-6). Thus, Plaintiff has exhausted her administrative remedies, and the ALJ's decision stands as the final decision of the Commissioner subject to judicial review.

To be entitled to disability benefits under Title II of the Act, Plaintiff has the burden to show that she was disabled prior to the expiration of her insured status on June 30, 2013 (Tr. 20, 220). *See* 20 C.F.R. § 404.130; *Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990). To be entitled to supplemental security income under Title XVI of the Act, Plaintiff must show that she was disabled while her application was pending. *See* 42 U.S.C. § 1382c; 20 C.F.R. §§ 416.330 and 416.335. Thus, the relevant period for consideration in this case is from August 1, 2012, the date Plaintiff alleges that she became disabled, through August 16, 2016, the date of the ALJ's decision.

### II.     Relevant Facts

Plaintiff Billie Jo Swafford was born in 1979; reported a high school education (GED); and alleged the commencement of disability on August 1, 2012. (Tr. 20, 170). Plaintiff's insured status under Title II of the Act expired on June 30, 2013. (Tr. 20, 220). She has past relevant work as a shearing machine operator which is considered heavy exertional level, unskilled work. (Tr. 40).

The ALJ discussed the Plaintiff's mental health and medical history in detail in his lengthy decision. The parties also thoroughly discussed Plaintiff's mental health and medical records in their briefings to this Court. The Court incorporates those discussions herein and will detail this history only as necessary to address the issues raised in this case.

The ALJ made the following findings in his August 16, 2016 decision:

- Plaintiff has not engaged in substantial gainful activity since August 1, 2012, the alleged onset date. (Tr. 22).

- Plaintiff has severe impairments of bipolar II disorder, persistent depressive disorder, conduct disorder, generalized anxiety disorder, and obsessive-compulsive disorder. (Tr. 22).

- Plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 28).

- Plaintiff retained the residual functional capacity ("RFC") to perform the full range of work at all exertional levels but with the following non-exertional limitations:

  - can understand, remember, and carry out simple and low-level detailed tasks, but not multistep detailed tasks;

  - can maintain concentration, persistence, and pace for two-hour periods over an eight-hour workday with customary breaks;

  - would have infrequent interruptions from mental health symptoms and infrequent absences due to mental health symptoms (less than one time per month);

  - would work better with things than with people—needs nonconfrontational and supportive supervision;

  - can respond appropriately to supervision, coworkers, and work situations;

  - can have no contact with the general public;

  - contact with coworkers and supervisors can be occasional, but interaction should be superficial; and

- can deal with changes in a routine work setting on an infrequent (less than occasional) basis. (Tr. 38).

- Claimant is unable to perform any past relevant work. (Tr. 40).

- There are jobs in significant numbers in the national economy that Plaintiff can perform, including light and medium unskilled work as a bin cleaner, box bender, gluer, sorter, and bin filler (Tr. 41).

- Consequently, the ALJ found that Plaintiff was not disabled (Tr. 41).

## III.     Discussion

### A.     Standard of Review

The determination of disability under the Act is an administrative decision. To establish disability under the Social Security Act, a claimant must establish she is unable to engage in any substantial gainful activity due to the existence of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. §§ 404.1520; 416.920. The following five issues are addressed in order:  (1) if the claimant is engaging in substantial gainful activity she is not disabled; (2) if the claimant does not have a severe impairment she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment she is disabled; (4) if the claimant is capable of returning to work she has done in the past she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. §§ 404.1520; 416.920; *Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990). Once, however, the claimant makes a *prima facie* case that she cannot return to her former occupation, the burden shifts to the

Commissioner to show that there is work in the national economy which she can perform considering her age, education and work experience. *Richardson v. Sec'y of Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner made any legal errors in the process of reaching the decision. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (adopting and defining substantial evidence standard in the context of Social Security cases); *Landsaw v. Sec'y of Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision-makers. It presupposes there is a zone of choice within which the decision-makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y, Health and Human Servs.*, 790 F.2d 450 n.4 (6th Cir. 1986).

The court may consider any evidence in the record, regardless of whether the ALJ cited it. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). However, for purposes of substantial evidence review, the court may not consider any evidence that was not before the ALJ. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the Court is not obligated to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-cv-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not

made by claimant were waived), and "issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived,'" *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

**B.     Analysis**

Plaintiff raises three issues, alleging the ALJ erred in: (1) the ALJ's consideration of her obesity; (2) the ALJ's evaluation of the opinion evidence; and (3) the ALJ's evaluation of Plaintiff's subjective symptoms. The Court will address these issues in turn.

**1.     Did the ALJ fail to consider Plaintiff's obesity in accordance with Social Security Ruling 02-01p?**

Plaintiff argues that the ALJ erred by failing to consider or evaluate her obesity in accordance with Social Security Ruling ("SSR") 02-01p. The ALJ specifically found that obesity is not a severe medical impairment stating, "obesity . . . is not consistently present throughout the period at issue, and . . . is not even alleged to have caused or exacerbated any physical or mental limitations." (Tr. 28).

SSR 02-01p recognizes that "[o]besity is a risk factor that increases an individual's chances of developing impairments in most body systems."  SSR 02-01p. There are levels of obesity:

> The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs [Body Mass Index][1] of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but *they do not correlate with any specific degree of functional loss.*

*Id.* (emphasis added).

---

[1] "BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters ($kg/m^2$). For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as "overweight" and a BMI of 30.0 or above as 'obesity.'" SSR 02-1P.

The Sixth Circuit has held that SSR 02–1p does not offer "any particular procedural mode of analysis for obese disability claimants." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. Jan.31, 2006)). Rather, it provides that "obesity, in combination with other impairments, 'may' increase the severity of the other limitations." *Id.* (quoting *Bledsoe*, 165 F. App'x at 412). However, obesity should be evaluated on a case-by-case basis because it "may or may not increase the severity or functional limitations of the other impairment." SSR 02–1p. An ALJ's explicit discussion of the plaintiff's obesity indicates sufficient consideration of his obesity. *See Coldiron,* 391 F. App'x at 443.

While Plaintiff cites instances in the record where her reported weight corresponded with a body mass index ("BMI") over 30 (Tr. 297, 470-73), the ALJ correctly stated that obesity was not consistently present throughout the period at issue (Tr. 28). The Court also notes that Plaintiff's obesity levels, when present, did not exceed Level I in the Clinical Guidelines. For example, the following chart consists of the BMIs recorded by Volunteer Behavioral Health Care (Volunteer) in treatment notes in 2015 and 2016:

| Date | BMI | Transcript Page |
|------|-----|-----------------|
| April 7, 2015 | 32.36 | Tr. 470 |
| June 4, 2015 | 32.95 | Tr. 471 |
| August 4, 2015 | 33.94 | Tr. 472 |
| November 3, 2015 | 30.95 | Tr. 473 |
| February 18, 2016 | 28.29 | Tr. 474 |
| April 12, 2016 | 24.46 | Tr. 475 |

In discussing the medical evidence, the ALJ noted several reports of BMI's under 30 in Plaintiff's primary care physician notes and Volunteer medical records (Tr. 22-23, 26-27, 288, 290, 294-96, 474-75), as well as reports of weight gain and loss in the Volunteer records (Tr. 26-27, 439, 442, 448, 454). The ALJ concluded that "her obesity, which is not consistently present

throughout the period at issue," did not constitute a severe impairment. (Tr. 28). The ALJ noted that other physical conditions such as her hypertension and hypothyroidism had resolved. (Tr. 28). The ALJ further correctly noted that Plaintiff had not alleged in her application nor at her hearing that her obesity "caused or exacerbated any physical or mental limitations." (Tr. 28, 50, 173).

An ALJ need not specifically cite a ruling when the record shows that the ALJ's analysis complied with the ruling. *See Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, *3 (6th Cir. 2017) ("Explicitly citing SSR 03-2p would not have substantively changed the ALJ's analysis, and the fact that her inquiry actually comported with the directives of SSR 03-2p is evidence that she was aware of the administration's policy for evaluating RSD claims and applied that policy.") In this case, the ALJ considered obesity, considered medical records that documented Plaintiff's weight, and determined that obesity was not a severe impairment and did cause or exacerbate any physical or mental limitations (Tr. 26-28). The Court concludes the ALJ did not fail to properly consider Plaintiff's weight in light of SSR 02-1p.

### 2.      Did the ALJ fail to properly evaluate the opinion evidence?

Plaintiff notes that there are opinions from four sources who examined, interviewed, and/or treated Ms. Swafford. According to Plaintiff, "these opinions are consistent with her allegations of disabling limitations and find support in the treatment notes and medical evidence of record." (Doc. 19, Plaintiff's brief at 10). Plaintiff asserts that the ALJ improperly gave more weight to Disability Determination Services ("DDS") medical sources who never examined Ms. Swafford and whose opinions were provided by November 2014—prior to availability of the majority of medical evidence of record. (*Id.*). Plaintiff also asserts the "ALJ significantly misrepresented and/or mischaracterized critical evidence regarding the treatment notes and severity of Ms.

Swafford's impairments." *Id.*

Plaintiff saw Dee Langford, Ed.D., on July 14, 2014, for a consultative psychological evaluation. (Tr. 277-81). Plaintiff reported that she lived in a house with her husband and two daughters and drove herself to the examination. (Tr. 277). She reported that she had no periods of in-patient hospitalizations for mental health problems. (Tr. 278). On examination, Plaintiff was oriented to person, place, and time. (Tr. 279). She appeared tired, but maintained good eye contact, had normal speech, and her thought processes seemed logical and clear. (Tr. 279). Plaintiff showed mild impairment in short term memory, moderate impairment of her ability to sustain concentration, and no evidence of impairment in her long term and remote memory functioning (Tr. 279). Plaintiff reported that she prepared meals, managed her medications, managed her finances with some difficulty, vacuumed, swept, and did laundry, and attended church regularly (Tr. 280). Dr. Langford stated that Plaintiff might be an unlikely candidate for employment until she gets her emotions under control and that she showed evidence of marked limitations in social relating and her ability to adapt to change. (Tr. 281).

Nurse practitioner, Lynda Smith, FNP-BC, wrote a letter on August 26, 2014, and stated that Plaintiff was treated for bipolar depression. (Tr. 318). Her practitioners were attempting to stabilize her mood with medications and behavior therapy. (Tr. 318). She opined Plaintiff was unable to work due to fluctuating moods and unstable actions at that time. (Tr. 318).

Ms. Smith and Mark McKenzie, M.D., Plaintiff's primary care physician who practices Internal Medicine (Tr. 318), completed a mental impairment questionnaire on September 29, 2014. (Tr. 476-80). The treatment providers indicated they began treating Plaintiff in May 2010; saw her every two weeks; and last provided treatment on August 8, 2014. (Tr. 476). They indicated Plaintiff had moderate to marked degree of limitation regarding understanding and memory, and

moderate to marked or marked limitations in all listed functions under the categories of concentration and persistence, social interactions, and adaptation. (Tr. 479). They also indicated that Plaintiff became more anxious around others; her paranoia was increasing, especially when expectations increased; Plaintiff would likely be absent from work due to her mental impairments more than three times per month; and her symptoms and limitations existed since January 1, 2012. (Tr. 480).

Mental health counselor, John Gulley, Ph.D., also provided narrative reports in October and November 2014. (Tr. 315-16). Dr. Gulley indicated in his report that he had treated Plaintiff twice—once in November 2013 and once in August 2014. (Tr. 315). Dr. Gulley stated Plaintiff's diagnoses included bipolar II disorder, recurrent major depressive episodes, and hypomanic episodes with a depressive specifier. (Tr. 315-16). Dr. Gulley further indicated that that her diminished function, chronic condition, family history, traumatic onset, and generalized mood/function all yielded a guarded optimism for recovery; however, with proper pharmacological management and treatment, some substantive remission and even reversal in some of the more acute symptoms would be expected, with a return to a more normative function (Tr. 315-16).

Additionally, the documents available to the ALJ included treatment records from primary care physician Dr. McKenzie, dated March 12, 2010, through August 8, 2014. (Tr. 286-314), as well as treatment records from Volunteer from December 16, 2014, through May 12, 2016. These records reflect medication management, a psychiatric diagnostic evaluation, and case management assessment and follow-up visits (Tr. 325-75) and are discussed in more detail below with regard to the issues raised by Plaintiff.

The record also contains opinions regarding Plaintiff's mental limitations from a non-

examining state agency psychologists dated August 4, 2014, and November 4, 2014, finding Plaintiff not disabled. (Tr. 66-76, 86-95). In both opinions, the state agency psychologists opined Plaintiff had no significant limitations in the ability to carry out short simple instructions and to make simple work-related decisions. (Tr. 72, 94). They found moderate limitations in the ability to carry out detailed instructions, to maintain concentration and attention for extended periods of time, to maintain a regular schedule and attendance, and to work in coordination with or proximity to others without being distracted. (Tr. 72, 94). They found Plaintiff had marked limitations in the ability to interact appropriately with the general public and that she was moderately limited in the ability to accept instruction from supervisors, to get along with coworkers or peers, and to respond appropriately to changes in the workplace. (Tr. 73, 95). In addition, they both opined that Plaintiff would have *infrequent* absences from work due to mental health symptoms, but generally could perform consistently with customary breaks within designated restrictions. (Tr. 72, 94-5).

An examination of the ALJ's decision shows that he thoroughly discussed medical opinion evidence throughout his opinion, and that he discussed how it related to Plaintiff's medical records and to what degree it supported Plaintiff's limitations as reflected in his RFC determination (Tr. 23-40). In summarizing the weight given to the various medical opinions and medical evidence, the ALJ stated:

> As for the opinion evidence, as previously noted, I gave great weight to the DDS Title XVI mental assessments (Exhibits 4A; 8A), little weight to the DDS Title II mental assessments (Exhibits 3A; 7A), some weight to the consultative psychological evaluation (Exhibit 1F), some weight to Dr. Gulley's opinions (Exhibit 4F/pages 1 to 2), some weight to the medical source statement signed by Dr. McKenzie and Ms. Smith (Exhibit 7F), some weight to the primary care treatment notes (Exhibit 3F), little weight to the opinion of Ms. Smith (Exhibit 4F, page 4), significant weight to the Volunteer records with little weight to the GAF scores (Exhibit 6F), and great weight to the DDS medical consultant's assessments (Exhibits 7A; 8A), for the reasons set forth above.

(Tr. 39-40).

Social Security regulations and rulings address the manner in which medical opinions—including those of a treating doctor—are considered. *See* 20 C.F.R. §§ 404.1527, 416.927; SSR 96-2p. The regulations state that a treating physician's opinion is due "controlling weight" if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Id*. If the opinion cannot be given controlling weight, the regulations require the ALJ to provide "good reasons" for discounting the weight given to a treating source opinion. *Id*.; SSR 96-2p. The reasons provided must be "supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). However, "[t]he ALJ is not required to simply accept the testimony of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence." *Griffith v. Comm'r of Soc. Sec.,* 582 F. App'x 555, 564 (6th Cir. 2014) (citing 20 C.F.R. § 416.927(b)); *Bell v. Barnhart*, 148 F. App'x 277, 285 (6th Cir. Aug. 7, 2014) (declining to give weight to a doctor's opinion that was only supported by the claimant's reported symptoms).

As previously discussed, the RFC is based on all of the relevant evidence in the case record and is assessed at step four of the sequential evaluation. Because the RFC is based on all of the evidence, the ALJ is not limited to choosing between competing opinions in the record but may instead develop his or her own assessment of residual functional capacity. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) ("The ALJ parsed the medical reports and made

necessary decisions about which medical findings to credit, and which to reject. Contrary to Justice's contention, the ALJ had the authority to make these determinations"); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (In determining a claimant's RFC, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians.").

In discussing the weight given to the various medical opinions, the ALJ stated that he gave some weight to the July 2014 opinion of consultative examiner Dee Langford, Ed.D. (Tr. 23-24, 29, 34, 277-81). In doing so, the ALJ reasoned that this was a one-time examination; the doctor did not have the benefit of reviewing other evidence of record; the examination was internally inconsistent at times; and the doctor assessed some functional limitations in excess of those supported by other evidence in the record (Tr. 29). The ALJ properly gave Dr. Langford some weight.

Dr. Langford found that Plaintiff might be an unlikely candidate for employment until she gets her emotions under control, and that she showed evidence of marked limitations in social relating and her ability to adapt to change (Tr. 281). However, Dr. Langford also noted that Plaintiff denied any inpatient mental health treatment; drove herself to the examination; lived in a house with her husband and two children; maintained good eye contact during the interview; demonstrated normal speech and logical thought processes; and showed intact remote and long-term memory (Tr. 23, 277-79). Plaintiff also reported to Dr. Langford that her activities included caring for her children, driving, and attending church regularly (Tr. 23, 277, 280).

In discussing his finding that Plaintiff had only a moderate limitation in social functioning, the ALJ noted that Volunteer records from early to mid-2015 indicated she was less angry, got out of the house more, took walks with her family, went out with her daughters a lot more, and enjoyed

going to visit relatives (Tr. 32, 342-52). In October 2015, Plaintiff reported that she recently enjoyed a visit from an old friend (Tr. 33, 364). Plaintiff also noted in her Function Report that she went to church every Sunday, shopped for groceries once a week, and denied any job losses due to problems getting along with others (Tr. 33, 241-42, 244).

The ALJ also considered and gave some weight to Dr. Gulley's opinions (Tr. 29, 315-17). The administrative record indicates Dr. Gulley saw Plaintiff twice for treatment: once in November 2013 and once in August 2014. (Tr. 316). Dr. Gulley prepared reports in October 2014, indicating that Plaintiff's diminished function, chronic condition, family history, traumatic onset, and generalized mood/function all yielded a guarded optimism for recovery. The reports went on to say that, with proper pharmacological management and treatment, some substantive remission and even reversal in some of the more acute symptoms would be expected, with a return to a more normative function (Tr. 24, 315-17).

In giving some weight to Dr. Gulley, the ALJ reasoned that, although Dr. Gulley had a longitudinal relationship with Plaintiff, he did not provide any detailed treatment notes for comparison, and many of his "statements were conclusory and thus provided little guidance on the issues" (Tr. 29, 34). Plaintiff's other records supported Dr. Gulley's opinion that Plaintiff's symptoms would improve with proper treatment and management, including recent records from Volunteer (Tr. 34). For instance, on March 21, 2016, Plaintiff denied all issues with depression, anxiety, paranoia, hallucinations, and sleep, and she reported medication compliance with no side-effects (Tr. 27, 370). On May 12, 2016, Plaintiff stated that she was "very much better on medications" (Tr. 27, 454). Plaintiff also reported that she was going to Florida for a family vacation (Tr. 27, 376). The ALJ properly gave Dr. Gulley's opinion some weight.

The ALJ also considered and gave some weight to the observations of Plaintiff's primary

care physician, Dr. McKenzie, and his medical source statement dated September 29, 2014 (which was also signed by his nurse practitioner, Ms. Smith). (Tr. 22-23, 27, 29, 478-80). Dr. McKenzie indicated Plaintiff was "easily confused." He further indicated that she had moderate limitations in her ability to remember locations and work-like procedures; moderate limitations in her ability to understand and remember detailed instructions; moderate to marked limitations in her ability to understand and remember one-to-two step instructions; and moderate to marked limitations in all aspects of social interaction, adaptation, concentration, and persistence. (Tr. 28, 478-79). The doctor also indicated Plaintiff was more anxious around people, was paranoid, and would likely be absent from work more than three times per month due to her impairments and treatment. (Tr. 28, 480).

In giving some weight to Dr. McKenzie's opinion, the ALJ reasoned that Dr. McKenzie was not a mental health expert, and his treatment notes provided little detail regarding Plaintiff's signs and symptoms and did not support the full range of his proposed limitations. (Tr. 29, 33-34, 286-314). The ALJ noted that "[w]hile his records do include complaints of irritability, anger issues with her husband, and picking fights over small issues, they contain nothing to support the opinions on [Plaintiff's] ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism, get along with coworkers without distracting them, maintain socially appropriate behavior, and adhere to basic standards of neatness, among others. (Tr. 33- 34, 286-314).

The ALJ also found that Dr. McKenzie saw Plaintiff less frequently than he reported. (Tr. 29, 33). Plaintiff testified that she had seen Dr. McKenzie but usually dealt with his nurse practitioner. (Tr. 33, 53). Furthermore, treatment records from this source from 2010 through 2014, indicate relatively few mental health visits over that length of time. (Tr. 286, 288, 290, 294, 296),

as well as visits and records for non-mental related health issues. (Tr. 33, 293, 297, 299, 301, 304, 306-14).

Finally, the ALJ found Dr. McKenzie's opinion to be internally inconsistent. (Tr. 35-36). While he assessed a moderate to marked limitation in Plaintiff's ability to understand and remember one or two instructions, he set forth only a moderate limitation in her ability to understand and remember detailed instructions. (Tr. 36, 479). The ALJ found that this inconsistency "further highlights the unreliability of this medical source statement and supports giving little weight to the more extreme limitations proposed." (Tr. 36). With regard to Dr. McKenzie's opinion that Plaintiff would miss work more than three times per month, the ALJ countered that Plaintiff had not missed scheduled medical appointments; and she had managed a household, cared for two small children, and performed other tasks for her mother and others as needed, "none of which suggest a significant problem in her persistence." (Tr. 36, 241-42, 277, 280, 362).

A physician's opinion may be properly discredited because it is inconsistent with the treatment record and the record as a whole. *See Gault v. Comm'r of Soc. Sec.*, 535 F. App'x 495, 496 (6th Cir. 2013) (ALJ properly "rejected the conclusion that Gault had marked mental limitations on the basis that it conflicted with her benign clinical examinations, conservative course of treatment, and daily activities") (*per curiam*).

Plaintiff, however, does not agree with the ALJ's assessment of Plaintiff's treatment for her mental illness. Plaintiff argues

> one of the most obvious, significant misrepresentations by the ALJ was that Ms. Swafford's "treatment has involved little more than quarterly medication management appointments, which does not suggest the degree of symptoms she alleges, which reasonably would involve more extensive outpatient treatment and quite possibly inpatient treatment as well, something that has never been suggested here." Tr. 39. **This is a blatant misrepresentation of the mental health treatment**

**notes, as the record indisputably documents Ms. Swafford's treatment through Volunteer Behavioral Health on a much more frequent basis than the ALJ stated**. Tr. 325-475.

(Doc. 19, Plaintiff's brief at 15) (emphasis original). The Court reviewed carefully the records from Volunteer at pages 325-475 of the record. It appears to the Court that the ALJ did not consider her visits with a case manager to be mental health *treatment*. From February 2015 to March 2016, Plaintiff met twenty-two times with a case manager from Volunteer. The ALJ did make note of these visits and discussed the reports from these visits in his decision. (Tr. 25-27). The notes do not indicate that the case managers were licensed mental health providers. On December 16, 2014, Volunteer offered to provide Plaintiff individual therapy, and she declined it. (Tr. 337). The ALJ specifically noted this fact. (Tr. 25). On March 25, 2015, a case manager asked Plaintiff again if she would like individual therapy. Plaintiff declined once again. The case manager offered "emotional support and attentive listening." (Tr. 344). The ALJ also noted that a therapy referral was made on March 28, 2016, but that no therapy sessions were reported. (Tr. 27). The Court concludes that the ALJ did take into account her visits with the case managers in this case, as he discussed them at length in his decision, and that he did not mischaracterize Plaintiff's mental health treatment with Volunteer.

The ALJ also considered and gave little weight to the opinion of Lynda Smith, Plaintiff's nurse practitioner, who worked for Dr. McKenzie. (Tr. 24, 29, 318). Ms. Smith reported on August 26, 2014, that Plaintiff was under treatment for bipolar depression; she received medication and behavior therapy; and she was unable to work due to her fluctuant moods and unstable actions. (Tr. 24, 318). The ALJ noted that Ms. Smith was not an acceptable medical source and found she provided only a conclusory opinion on an issue reserved to the Commissioner. (Tr. 29, 318). "Other sources" are medical sources that are not "acceptable" medical sources for the purpose of

establishing the existence of a medical determinable impairment, such as nurse practitioners, physicians' assistance, and therapists, and the ALJ has discretion to determine the proper weight to accord opinions from "other" sources. *Engebrecht v. Comm'r of Soc. Sec.*, 572 F. App'x 392, 398 (6th Cir. 2014) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir.2007) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir.1997))); 20 C.F.R. §§ 404.1513(d) (Sept. 3, 2013 to Mar. 26, 2017), 416.913(d) (Sept. 3, 2013 to Mar. 26, 2017) (defining "other" sources). Furthermore, an opinion that an individual is "disabled" is not entitled to special significance, as disability determinations are "the prerogative of the Commissioner." *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 472 (6th Cir. 2014) (citing *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)).

Finally, the ALJ properly considered the opinions of the non-examining state agency mental consultants who reviewed the evidence in August and November 2014, and concluded Plaintiff had moderate limitations of her mental functioning. (Tr. 24, 66-76, 86-95). The ALJ found these assessment were entitled to great weight as they were prepared by mental health professionals who had the opportunity to review the record. Further, their opinions that Plaintiff experienced moderate mental limitations were supported by the record as a whole including Plaintiff's treatment records and reported activities of daily living. (Tr. 29, 34, 36, 39, 66-76, 86-95). The ALJ may give "great" weight to the opinions of State non-examining doctors when these opinions are supported by the record as a whole. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("ALJ gave appropriate weight to Dr. Caldwell's and Dr. Torello's opinions because both were supported by the record as a whole.").

Plaintiff argues that the ALJ erred in giving a great deal of weight to the state agency physicians because they did not have adequate or more recent evidence on which to base their

opinions. Indeed, "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision." *Jones v. Colvin*, No. 5:13CV1781, 2014 WL 4594812, at *3 (N.D. Ohio Sept. 12, 2014) (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011)). However, agency regulations "impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Id.* The Sixth Circuit has squarely rejected the argument that the ALJ "improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in [the claimant's] medical condition" where it is clear from the decision that the ALJ considered the subsequent evidence and "took into account any relevant changes" in the claimant's condition. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).

The ALJ evaluated and weighed the various medical opinions in the record and utilized them in determining the extent of Plaintiff's mental limitations. In limiting Plaintiff to: simple and low-level detailed but not multi-detailed tasks; two-hour segments of concentration and persistence with customary breaks; working with things rather than people; non-confrontational and supportive supervision; no contact with the general public; occasional and superficial interaction with coworkers and supervisors; and only infrequent changes in a routine work setting, the ALJ adequately accounted for the level of mental limitations supported by the overall record.

### 3. Did the ALJ Properly Evaluate Plaintiff's Symptoms and Allegations as Required by SSR 16-3p?

Plaintiff next argues that the ALJ failed to properly evaluate the consistency of her symptoms and allegations pursuant to SSR 16-3p. SSR 16-3p provides guidance as to how the Social Security Administration evaluates the statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims. Plaintiff argues that the "ALJ essentially 'cherry-picked" a few bits and pieces of the evidence and recited those without any reasonable basis for discrediting Ms. Swafford's allegations." (Doc. 19, Plaintiff's brief at 17).

While the ALJ found that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms, "he determined that Plaintiff's "statements concerning their intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 38). An examination of the ALJ's decision shows that he set forth and discussed the relevant evidence in a thorough and detailed manner. (Tr. 23-40).

In evaluating the consistency of Plaintiff's alleged symptoms and limitations, the ALJ properly considered several factors throughout his decision including medical opinion evidence as discussed above. The ALJ also considered the lack of complaints to Plaintiff's treatment providers regarding disabling limitations and the lack of objective testing or other information supporting such disabling limitations in the treatment records. (Tr. 22-27, 30-36, 39). Mental impairments also have objective findings—the lack of objective evidence here does not support Plaintiff's complaints. *See Stankoski v. Astrue*, 532 F. App'x 614 (6th Cir. 2013) (Plaintiff claimed crying spells and low energy, "[y]et there was no objective evidence to support these complaints") (citation omitted).

The ALJ considered Plaintiff's activities of daily living that were inconsistent with disabling limitations and included caring for two small children and caring for her mother and assisting other family members. (Tr. 39, 241-42, 277, 280, 362). The ALJ may consider daily activities as one factor in the evaluation of subjective complaints. *See Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) ("Further, the ALJ did not give undue consideration to Temples' ability to perform day-to-day activities. Rather, the ALJ properly considered this ability as one factor in determining whether Temples' testimony was credible."); 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p.

The ALJ also considered inconsistencies between the evidence and Plaintiff's allegations. For example, Plaintiff testified at her June 2016 administrative hearing that she could not sleep due to racing thoughts. (Tr. 53), but one month earlier she told Volunteer that she sleeps about nine hours per night. (Tr. 39, 454).[2]

Finally, the ALJ considered the conservative and effective nature of Plaintiff's treatment. (Tr. 39). As discussed previously in his decision, Plaintiff's medical records, including Volunteer records from early to late 2015, and early to mid-2016, indicated that her symptoms improved with treatment and medication. (Tr. 39, 340-54, 364, 370-76). While Plaintiff argues that the ALJ blatantly misrepresented the mental health treatment notes by characterizing her treatment as involving "little more than quarterly medication management appointments," the evidence does

---

[2] The ALJ also found inconsistent Plaintiff's assertion to the consultative examining physician on July 14, 2014, that she lost 63 pounds "over the past year" due to decreased appetite and increased stress (Tr. 39, 278). The ALJ noted her primary care provider recorded her weight as 164 pounds only three days prior to that evaluation (Tr. 39, 290), and her weight was 170 pounds at two prior examinations in October and December 2013 (Tr. 39, 294, 296). The Court notes, however, that on November 8, 2012, Plaintiff's primary care physician recorded Plaintiff's weight as 231 lbs., meaning between November 8, 2012 and July 11, 2014, Plaintiff lost 67 lbs. The Court finds no inconsistency here in Plaintiff's testimony, but the ALJ's error in this regard is harmless. His decision is supported by substantial evidence whether or not the Plaintiff's testimony regarding her weight loss is credible. Thus remand for further consideration of Plaintiff's weight loss would be pointless. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) (finding remand inappropriate where "[n]o purpose would be served" and no different outcome would result.).

support the ALJ's finding that her condition improved and was not suggestive of disabling limitations. (Tr. 39). Moreover, an examination of Plaintiff treatment records from The McKenzie Center from 2010 to August 2014. (Tr. 296-305), and Volunteer from December 2014 to May 2016. (Tr. 325-475), does indicate routine management of symptoms and medication refills involving treatment with a nurse practitioner and off-site case-management visits with some missed appointments and telephone call follow-ups. (Tr. 286-305, 380-89, 391-97). Finally, the Court finds especially telling the Plaintiff's refusal to accept individual therapy which was offered to her at least three times as a way to address her allegedly debilitating mental illness. A "conservative treatment approach suggests the absence of a disabling condition." *Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. 2013) (Plaintiff declined more aggressive treatment and relied on over-the-counter medications.)

The ALJ properly evaluated Plaintiff's alleged symptoms in a manner that was consistent with SSA's regulations and policies. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p. The evaluation of Plaintiff's alleged symptoms rests with the ALJ, and "[a]s long as the ALJ cite[s] substantial, legitimate evidence to support his factual conclusions, we are not to second-guess." *Ulman v. Comm'r of Soc. Admin.*, 693 F.3d 709, 713–14 (6th Cir. 2012).

## IV.    Conclusion

The ALJ properly considered the entire record in evaluating the opinions, the medical evidence, and Plaintiff's subjective complaints and set forth supported reasons for his findings. In limiting Plaintiff to a range of simple and low-level work without multistep detailed tasks and with additional limitations on interacting with others and dealing with routine changes on an infrequent basis, the ALJ adequately accommodated Plaintiff's supported level of moderate mental symptoms and limitations. Substantial evidence supports the ALJ's decision. Accordingly, the Plaintiff's

motion for judgment on the record will be **DENIED**, the Commissioner's motion for Summary

Judgment will be **GRANTED**, and the decision of the Commissioner will be **AFFIRMED**.

      **ENTER.**

                                        /s/ *Christopher H. Steger*
                                        UNITED STATES MAGISTRATE JUDGE